WASHINGTON MOBILIZATION
COMMITTEE et al., Appellees,

v.

Maurice J. CULLINANE, Chief of the
Metropolitan Police Department, et
al., Appellants.

No. 75–2010.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 23, 1976.

Decided April 12, 1977.

Rehearing En Banc Denied Sept. 14, 1977.

David P. Sutton, Asst. Corp. Counsel for the District of Columbia, Washington, D. C., with whom C. Francis Murphy, Corporation Counsel, Louis P. Robbins, Principal Asst. Corp. Counsel and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief for appellants.

John Vanderstar, Washington, D. C., with whom Ralph J. Temple and John H. Quinn, Jr., Washington, D. C., were on the brief for appellees.

Before MacKINNON and ROBB, Circuit Judges, and BRODERICK,* United States District Judge for the Eastern District of Pennsylvania.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

The Chief and five ranking officers of the Metropolitan Police Department of the District of Columbia appeal from the District Court's decree granting equitable relief to the plaintiffs. The named plaintiffs are eleven individuals who participated in one or more demonstrations in Washington in 1969–71, and the Washington Mobilization Committee and the Committee to Defend the Conspiracy, two unincorporated associations that assisted in organizing some of the demonstrations. A class represented by the eleven individuals consists of "all persons who have participated in or observed and who intend to participate in or observe lawful, peaceful, orderly and non-obstructive public demonstrations for the exercise of

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

their constitutional rights of free speech and assembly." *Washington Mobilization Committee v. Cullinane,* 400 F.Supp. 186, 190 n.2 (D.D.C.1975).

The District Court's decree, entered August 27, 1975, is founded on its analysis of evidence concerning seven public demonstrations in Washington during the years 1969–71. The evidence, adduced in a trial lasting three weeks, consisted of testimony from many witnesses, together with depositions and affidavits from many others. On the premise that the demonstrations were protected by the First Amendment the District Court granted the following relief:

1. The court concluded that both the District of Columbia police line regulation (D.C. Police Reg., Art. VI § 5a) and the District of Columbia "failure to move on" statute (D.C.Code § 22–1121(2)) are vague and overbroad. The court enjoined enforcement or application of the police line regulation against demonstrators "unless and until the police department or the government of the District of Columbia specifies the scope and limits of the department's power to clear public areas, sufficient to inform both the police and the public of their responsibilities." 400 F.Supp. at 218. The evidence revealed that the police had used stationary police lines to block the progress of marches and moving police lines, or "sweeps", to enforce dispersal orders. The injunction applies to both uses of police lines. As for the "move on" statute the court limited its use to situations in which "a breach of the peace involving a substantial risk of violence has occurred or will occur". *Id.*

2. The court enjoined "mass arrests" when evidence of probable cause is not recorded at the time of arrest.

3. The court ordered expungement of the arrest records of members of the class who participated in any of the seven Washington demonstrations and for whom field arrest procedures or "normal booking procedures" were not used, or against whom probable cause to arrest was not actually established notwithstanding the use of standard procedures.

4. Finally, the court ordered the defendants to draft and promulgate a comprehensive manual specifying policies to be followed in dealing with future demonstrations. The manual was to provide "instructions in all of those problem areas identified in the Findings of Fact." *Id.* at 217. The draft of the manual was to be presented to the District Court for approval after it had been served on counsel for plaintiffs.

We reverse the District Court's judgment in several respects. We hold that the police line regulation is not afflicted with vagueness or overbreadth sufficient to invalidate it facially. We agree with the District Court that a limiting construction must be placed on the failure to move on statute to save it from overbreadth and vagueness but our limiting construction differs from that applied by the District Court. We find error in the District Court's conclusion that an arrest not supported by the contemporaneous recordation of evidence of probable cause is necessarily defective. We reverse the court's order directing the defendants to formulate and promulgate a manual of policies and procedures for dealing with demonstrations. We affirm the District Court's order granting expungement of arrest records.

To present the issues and the District Court's judgment in proper focus we briefly describe the seven demonstrations considered by the court, identifying each by the locality in which it occurred. They were:

## 1. DUPONT CIRCLE, NOVEMBER 14, 1969

Pursuant to a permit (App. 972–73), a group of 3000–5000 people (police estimate, App. 973) assembled in Dupont Circle at the convergence of Massachusetts, Connecticut and New Hampshire Avenues and "P" and 19th Streets, in the "embassy row" area of Washington. The avowed purpose of the assembly was to protest the Vietnam War. Later the group began to march up Massachusetts Avenue toward the Vietnamese Embassy which is about five blocks north-

west of the Circle. The demonstrators filled the street from building line to building line. (App. 974) When they reached Sheridan Circle, about one block from the Embassy, their advance was blocked by a line of about 150 police officers. The police ordered the demonstrators to disperse or return to Dupont Circle. The demonstrators did not do so peacefully. In the ensuing skirmishes with the police, there were "massive rounds of window breaking". (App. 968, 975) The District Court found that "the demonstrators became unruly, breaking windows and threatening police" before the police used tear gas "in an attempt to subdue the crowd." 400 F.Supp. at 192.

### 2. THE THREE SISTERS BRIDGE, NOVEMBER 16, 1969

On a Sunday afternoon, 300–400 persons marched up the C & O Canal towpath toward the proposed site of the Three Sisters Bridge over the Potomac, several hundred yards upstream from Key Bridge in the Georgetown area of Washington. The demonstrators voiced environmental objections to the construction of the bridge. The police, who had advance warning of the march, feared that the demonstrators would damage equipment at the construction site. A line of policemen prevented the demonstrators from proceeding along the towpath, which provided the only access to the site. At this stage the police sought merely to prevent the marchers from reaching the construction site and did not seek to disperse the demonstration. The demonstrators retreated slightly, then crossed the canal on a footbridge and walked along Canal Road, which parallels the Canal on its other side. The District Court found that "a large crowd gathered on Canal Road . . . . [T]he crowd became loud and disorderly . . . [and] began to block traffic proceeding along M Street and Canal Road. Police stationed in the area were subjected to verbal abuse and, in a few instances, were the targets of thrown objects." *Id.* at 193. According to the senior police officer at the scene, traffic on Canal Road was then "extremely heavy". (App.

987) When the police dispersed this crowd, it returned to the Georgetown residential area and turned north on 34th Street. A moving police line followed the crowd north along 34th Street and east along Prospect Street. Three squads of police were involved in this demonstration. *Id.*

### 3. WATERGATE APARTMENTS, FEBRUARY 19, 1970

Although they had no permit, 500–1000 persons (App. 610) marched from the George Washington University campus toward the Watergate Apartments on Virginia Avenue, which were chosen as a destination because several government officials lived there. The demonstrators occupied Virginia Avenue from curb to curb (App. 1171) at the early evening rush hour. (App. 992) The march began after a rally on the campus at which speakers protested the conviction by a jury in Chicago of seven persons for conspiracy to riot at the 1968 Democratic National Convention in Chicago. During the rally "[p]olice were not present or did not make their presence evident on the campus." *Id.* A line of 50 to 200 policemen blocked the route of the march at the intersection of New Hampshire and Virginia Avenues, about one block from the apartments. Apparently to divert traffic approaching the Watergate area from the east on Virginia Avenue, a second police line moved into position behind the demonstrators. This line blocked Virginia Avenue at its intersection with 23rd Street. The police ordered the demonstrators to disperse, but they did not do so. The District Court faulted the police for "a lack of communication and inadequate attempts to inform the crowd of their intentions," 400 F.Supp. at 194, but it is clear that demonstrators at the front of the crowd heard the police order. In response, they "began taunting the officers, verbally and physically. Epithets were directed toward the police, along with small stones and other objects. The evidence shows that this activity was uncoordinated and spasmodic." *Id.* The police line then began moving toward the demonstrators, pressing the crowd to-

ward the second police line at its rear.[1] At that point "more of the demonstrators began to verbally and physically threaten the officers . . .", *Id.* at 195, and the police sought to arrest the entire group. (App. 994) The police lines were moved so that eventually the demonstrators were "effectively surrounded". (App. 994) These maneuvers created a "stampede effect," 400 F.Supp. at 195, and as the demonstrators sought to flee "the police broke ranks and began chasing" them. *Id.* Nevertheless, a substantial number of demonstrators were not arrested, and "there undeniably was some unruliness on the part of the crowd leaving the Watergate, including the destruction of property . . .." *Id.*

As the police followed the demonstrators back toward the streets that pass through George Washington University, some demonstrators were "throwing rocks at the police". *Id.* at 196. The senior police officer at the scene stated that he observed some persons attempting to overturn cars. (App. 996)

### 4. WASHINGTON MONUMENT, FEBRUARY 21, 1970

This incident involved a confrontation between police and the remnant, about 600 persons strong (App. 1003, 1186), of a group of 5000 demonstrators. The main march, sanctioned by a permit as far as 3rd Street and Constitution Avenue, N.W., proceeded from the Department of Justice building to the District of Columbia Police Department Building. Protesting the conviction of the "Chicago Seven", it moved peacefully along the sidewalk and one side of Pennsylvania Avenue, without obstruction and "with little contact between demonstrators and police." 400 F.Supp. at 197. Some marchers, however, straggled back from the march terminus to the intersection of Fifteenth Street and Constitution Avenue. The police, fearful that these persons intended mischief at the White House, established a line on the north side of Constitution Ave-

nue. This line prevented the congregation at the intersection from crossing onto the Ellipse, adjacent to the grounds of the White House. After an announcement to clear the area, the police line moved south onto the mall surrounding the Monument. Although it was winter some tourists as well as demonstrators were on the Monument grounds. *Id.*

Sergeant Cecil W. Kirk of the Metropolitan Police Department, whose primary duty was to photograph police-demonstrator confrontations, testified that before the police line was formed and began to move south, he observed an unspecified number of demonstrators blocking the intersection at Fifteenth Street and Constitution Avenue, breaking up and burning trash receptacles, and throwing objects at cars, pedestrians and the police. (App. 1183–90) The District Court did not reject this testimony but found that defense witnesses "did not recite specific instances of misconduct which would have necessitated the sweep action, as opposed to making individual arrests." 400 F.Supp. at 198.

### 5. GEORGETOWN, OCTOBER 2, 1970

The facts concerning this demonstration are scanty. In describing it, the District Court stated merely that:

During the evening of October 2, 1970, a political demonstration took place in Georgetown. Chief Wilson was present at the scene of the protest and ordered a sweep of the lower blocks of Wisconsin Avenue. Defendants presented no evidence to indicate why this step was taken. One result of this decision was that a number of passersby and persons uninvolved with the demonstration were arrested in the Georgetown area.

*Id.* at 198.

Defendants did give evidence concerning this demonstration, although the witness, Police Chief Wilson, indicated that his memory was hazy. (App. 1363–64) According to Chief Wilson:

---

1. The District Court's findings indicate that police lines had not been used to block demonstrators' dispersal along 24th Street north and

G Street east. Both streets intersect with Virginia Avenue at points between the two police lines blocking Virginia Avenue.

There was a large crowd down at Wisconsin [Avenue] and it was generally peaceful. The intersection, as I recall, was pretty much filled. There began some stoning at the police, some waste baskets set on fire, some movement of the crowd up Wisconsin Avenue with the police in pursuit. . . . There was a group which stopped up in the vicinity, I guess, of Wisconsin and O, . . . and were stoning the police pretty heavily there. . . . So as I recall, we established a line from on roughly Wisconsin Avenue from M Street to R Street and essentially to disperse the group that was engaged in stoning the police and general trashing of the street.

(App. 1364) The purpose of the demonstration and the number of participants are not mentioned in the record.

### 6. WARD CIRCLE/AMERICAN UNIVERSITY, MAY 5–11, 1970

This series of incidents involved one of numerous protests in Washington against the incursion of American troops into Cambodia. The demonstrators, whose numbers ranged from the hundreds to the thousands were primarily students at American University, the campus of which abuts part of Ward Circle. The Circle sits at the convergence of two "heavily-travelled thoroughfares", Massachusetts and Nebraska Avenues. 400 F.Supp. at 199. The District Court found that "initial interaction between officers and demonstrators was minimal" on the first day of demonstrations, during which the demonstrators' activity consisted merely of "leafletting the area of Ward Circle adjacent to the campus". *Id.* The District Court's narrative proceeds:

On May 6, however, when the leafletters began to block traffic in the Ward Circle intersection, the tension between the groups increased. CDU [Civil Disturbance Unit] officers wearing gas masks and equipped with various gas projectiles were stationed around and in the Circle, facing the campus. Demonstrators were requested to vacate the streets and most did so . . . ..

It is unclear from the evidence which of the adversaries initiated the escalation. Demonstrators taunted police and threw marshmallows at them. After announcements to clear the area were made, the missiles changed to stones and rocks, inflicting injuries on a few officers. Lines of CDU police moved onto Nebraska Avenue, pushing the demonstrators back with their batons, but they were not successful in clearing the area or in stifling the bombardment of missiles. Deputy Chief Davis finally ordered the use of hand-thrown gas grenades . . . ..

*Id.* Some of the obstruction took place during rush hours. (App. 1010–11) Five days later a similar series of events erupted:

[S]tudents engaged in leafletting and other less peaceful activities. Rocks and debris were thrown in the streets. The police attempted to clear the thoroughfares around the Circle, but met the same resistance as before. Missiles were again directed toward police stationed at the Circle, ranging from marshmallows to rocks.

*Id.* at 200.

### 7. MAY DAY 1971, MAY 3–4, 1971

The District Court took judicial notice of the facts recited in this court's opinions concerning the May Day 1971 demonstrations, *Apton v. Wilson,* 165 U.S.App.D.C. 22, 506 F.2d 83 (1974), and *Sullivan v. Murphy,* 156 U.S.App.D.C. 28, 478 F.2d 938 (1973), and made no findings of fact of its own concerning them. The May Day 1971 demonstrations involved a substantial number of marches and assemblies during April 18– May 6. Judge Leventhal's opinion for this court in *Sullivan v. Murphy, supra,* shows that significant police interference was limited to the several demonstrations in this series that were violent or obstructive:

Throughout the week of April 18, protest activities had been nonviolent and generally well-disciplined. There were no serious encounters with police, and arrests were few. But following the march and rally of Saturday, April 24, a

more militant faction gained control of the protest, and some of the initial groups withdrew. The new demonstration leaders announced a program of mass civil disobedience. A program was developed to conduct protest activities at specific Government offices during the week of April 26, apparently with the hope of inducing Federal employees to join the protest by absenting themselves from work, and, if this should fail, to threaten a blockade May 3 of highways leading into the capital. The demands were for an immediate withdrawal of troops from Southeast Asia.

\* \* \* \* \* \*

[P]rotest leaders announced the specifics of their plan to block access to the city in the midst of Monday's [May 3] rush hour. Key points were selected for obstruction . . .. Most Federal employees live in the Maryland and Virginia suburbs and use these arteries daily in commuting to their offices. If the demonstrators' program had become effective, the result would have been a massive blockage of the operation of the Government.

\* \* \* \* \* \*

Several attempts were made [on May 3] to block the critical intersections with disabled vehicles and makeshift barriers, but the police removed these in short order. Police, fire and sanitation personnel also counteracted efforts to set trash containers afire and to strew the streets

with nails and broken glass. At Key Bridge and the 14th Street Bridges, demonstrators charged police lines en masse, but were repulsed by police with truncheons and barrages of tear gas.

\* \* \* \* \* \*

Their efforts to block access to the city having been effectively checked, the protesters turned their attentions once again upon specific Federal offices. On May 4 they demonstrated in front of the Department of Justice building. There was no violence, but sidewalks and building entrances were obstructed by throngs of people.

*Id.,* 156 U.S.App.D.C. at 37–39, 43, 478 F.2d at 947–49, 953 [footnotes omitted]. In *Apton v. Wilson, supra,* two members of the division expressed their conclusion that during May 3 and 4:

[t]he police did an admirable job in handling a mob of unprecedented proportions (150,000 people), many of whom were seeking to carry out an unlawful objective by unlawful means, and the results were accomplished without a declaration of martial law, without the intervention of the National Guard or Army troops, and with minimum physical injury to individuals.

165 U.S.App.D.C. at 36, 506 F.2d at 97 (MacKinnon, J. concurring and Wilkey, J. joining in Judge MacKinnon's expression of views).[2]

2. Judge MacKinnon noted that the avowed purpose of the demonstration on May 3 was to "close down the government". 165 U.S.App. D.C. at 36, 506 F.2d at 97. This statement is confirmed by the "May Day Tactical Manual" issued by the organizers of the demonstration and received in evidence as Fed.Ex. No. 5 in *Dellums, et al v. Powell, et al,* Nos. 75–1974, 75–1975, 75–2117 now pending in this court. We take judicial notice of this exhibit. The Manual states, P. 3:

The objective [of the demonstrations] is to close down all Federal government sections of Washington, D.C., by blocking traffic arteries during the early morning rush hours of May 3 and 4.

The Manual identifies and describes in detail, with a photograph of each, and a marked street

map, twenty-three "target areas" where traffic could be disrupted. It concludes (P. 24):

We expect most of the participants to be arrested and all participants to be prepared for possible arrest. It greatly enhances our tactical position if the jails and detention facilities are filled with demonstrators . . .. If solidarity is maintained and only those who absolutely must bail out leave everyone will be released together when Mayday is over. In jail, organization and solidarity can defeat efforts to divide and control us. . . . The maximum fine levied in Washington in mass arrest situations has been $25. In most cases the fine and bail has been $10. If we maintain our solidarity we should all be released with no charges.

## OVERBREADTH AND VAGUENESS

### Failure-to-Move-On Statute

The District of Columbia Code, section 22–1121(2), provides:

> Whoever, with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby—
>
> \* \* \* \* \* \*
>
> (2) congregates with others on a public street and refuses to move on when ordered by the police;
>
> \* \* \* \* \* \*
>
> shall be fined not more than $250 or imprisoned not more than ninety days, or both.

In *Von Sleichter v. United States*, 153 U.S.App.D.C. 169, 182, 472 F.2d 1244, 1257 (1972) we said:

> The issue of statutory overbreadth is not a problem in the District of Columbia, because our disorderly conduct laws, 22 D.C.Code §§ 1107, 1121, have been subjected to a narrowing construction by this court in *Williams v. District of Columbia*, 136 U.S.App.D.C. 56, 419 F.2d 638 (*en banc*, 1969).

In the *Williams* case, construing the profanity provision of section 22–1107, we held that it applied only to the utterance of language which threatens a breach of the peace

> [a]nd for these purposes a breach of the peace is threatened either because the language creates a substantial risk of provoking violence, or because it is, under "contemporary community standards," so grossly offensive to members of the public who actually overhear it as to amount to a nuisance.

136 U.S.App.D.C. at 64, 419 F.2d at 646 [footnotes omitted]. Applying this definition to section 22–1121(2) the District Court concluded that the police may not attempt to regulate the conduct of a demonstration by ordering persons to "move on" unless a breach of the peace is threatened or intended, and a substantial risk of violence is present. The court thought "the latter por-tion [of the definition] relating directly to profane language is not pertinent to the issue at hand . . . ." 400 F.Supp. at 210.

▇▇▇ We agree with the District Court that conduct creating a substantial risk of violence amounts to a breach of the peace under section 22–1121(2). We think however that the court erred in rejecting as "not pertinent" that part of the *Williams* definition relating to language which amounts to a nuisance. Just as language may amount to a nuisance, so may conduct. Specifically, in the context of section 22–1121(2), acts and conduct of demonstrators in obstructing streets and highways may amount to a nuisance and therefore constitute a breach of the peace within the *Williams* definition of that term. People blocking traffic at a critical intersection may breach the peace as fully as those who hurl stones.

> The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquillity. . . . When clear and present danger of riot, disorder, *interference with traffic upon the public streets,* or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious.

*Cantwell v. Connecticut*, 310 U.S. 296, 308, 60 S.Ct. 900, 905, 84 L.Ed. 1213 (1940) [emphasis supplied].

▇▇▇ The police have a duty to keep the streets and sidewalks open for the movement of traffic. *Schneider v. State*, 308 U.S. 147, 160, 60 S.Ct. 146, 84 L.Ed. 155 (1939). As we construe it, the failure-to-move-on provision of section 22–1121(2) is a reasonable regulation empowering the police to fulfill that duty. It does no more than that; in applying it the police must of course direct and control demonstrators only to an extent sufficient to protect legitimate state interests, which in this case are the free circulation of traffic and the free access of people to public buildings. In ordering obstructive demonstrators to "move on" the initial police objective must

be merely to clear passage, not to disperse the demonstrators, or to suppress the free communication of their views.

The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The control of travel on the streets of cities is the most familiar illustration of this recognition of social need. Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection.

*Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941). *See Colten v. Kentucky*, 407 U.S. 104, 109, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972); *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

### Police Line Regulation

Article VI, § 5a of the police regulations of the District of Columbia, commonly called the Police Line Regulation, was promulgated by the District of Columbia Board of Commissioners, now replaced by the City Council. It provides:

Sec. 5a. When fires, accidents, wrecks, explosions, parades, or other occasions cause or may cause persons to collect on the public streets, alleys, highways, or parkings, the Chief of Police, inspector, captain of police, or officer acting for him, may establish such area or zone as he considers necessary for the purpose of affording a clearing for: (1) the operation of firemen or policemen; (2) the passage of a parade; (3) the movement of traffic; (4) the exclusion of the public from the vicinity of a riot, disorderly gathering, accident, wreck, explosion, or other emergency; and (5) the protection of persons and property. Every person present at the scene of such an occasion, shall comply with any necessary order or instruction of any police officer. No person shall enter such area or zone, unless duly authorized by the person in command on such an occasion; Provided, That bona fide representatives of the press and bona fide insurance adjusters or underwriters and such other persons as the Chief of Police may authorize to be within such space, and who shall have plainly exposed to view the press pass or fire pass described in this section, shall be permitted within the lines established by the Police Department under the conditions named in the following paragraph . . . .

The District Court concluded that "the police line ordinance, as applied to demonstration activities (*i. e.,* those in which First Amendment rights are being asserted), is unconstitutionally vague and overly broad." 400 F.Supp. at 212. The court therefore enjoined the defendants "from erecting police lines and initiating sweeps of areas during demonstrations pursuant to [the regulation] . . . unless and until the police department or the government of the District of Columbia specifies the scope and limits of the department's power to clear public areas, sufficient to inform both the police and the public of their responsibilities." *Id.* at 218.

■ Vagueness may take two forms, both of which result in a denial of due process. A vague ordinance denies fair notice of the standard of conduct to which a citizen is held accountable. At the same time an ordinance is void for vagueness if it is an unrestricted delegation of power, which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and overzealous enforcement. *See Gregory v. City of Chicago*, 394 U.S. 111, 120, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969) (Black, J. concurring).

Both forms of vagueness are found when a legislature has defined proscribed conduct in subjective terms of taste. A citizen trying to observe the law and a policeman trying to enforce it, both in good faith, may

reach different conclusions about what the law proscribes. The cautious citizen, assuming that the policeman will enforce the vague law in its most restrictive sense, may steer cautiously and thereby unduly curtail his exercise of First Amendment rights. *See Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Recognizing these dangers, the Supreme Court has said that "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963).

■ The police line regulation challenged in this case does not rely on subjective terms to define proscribed conduct. Under the regulation a citizen must not cross a police line without authority and he must obey any police order necessary to effectuate any of the five specified purposes of the line. If the location of the line is clearly indicated and if adequate notice is given, which we interpret to be requirements implicit in the regulation, its application will not trap innocent persons. In short, it cannot be said that persons "of common intelligence must necessarily guess" at the meaning of the prohibition. *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).

The scope of the discretion given to the police by the regulation requires more detailed analysis and discussion. The question is whether the regulation is impermissibly vague because the bounds of police discretion are defined so imprecisely that they invite or authorize police action in violation of the First Amendment.

■ In scrutinizing the ordinance for vagueness we focus on the words of the ordinance itself, to "extrapolate its allowable meaning." *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (quoting Frankfurter, J., concurring in *Garner v. Louisiana*, 368 U.S. 157, 174, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961)). In so doing, we observe the rule of construction announced by the Municipal Court of Appeals for the District of Columbia,

that interpretation of a police regulation must be based upon reading the entire regulation rather than "a part or word thereof". *Siegman v. District of Columbia*, 48 A.2d 764, 766 (D.C.Mun.App.1946).

■ Turning to the language of the ordinance we see that a police line may be established upon the happening of "occasions [that] cause or may cause persons to collect on the public streets." Art. VI, § 5a. This clause is restricted by the functional limitations that follow it within the regulation. Any police line must be "necessary" to achieve one of three basic purposes: (1) clearing the way for the operation of firemen or policemen, a parade or the movement of traffic; (2) excluding the public from the vicinity of "a riot or disorderly gathering, accident, wreck, explosion or other emergency"; or (3) the protection of persons and property. We find no imprecision of constitutional magnitude in the statement of purposes (1) and (3); it appears to be a reasonable articulation of police duties. Purpose (2) permits the police to isolate the public from a "riot or disorderly gathering . . . or other emergency". There has been no assertion in this case that the term "riot" is vague. As we have seen the word "disorderly" has been defined by this Court in *Williams v. District of Columbia, supra*, so there is no imprecision in the phrase "disorderly gathering". Applying the rule of *ejusdem generis*, the word "emergency" takes the color of the five events that precede it in its clause. Because none of these events involves activities protected by the First Amendment we cannot assume that the word "emergency" in the clause expands it to encompass forbidden territory.

■ The District Court characterized as a "pernicious proscription" allowing "unfettered [police] discretion" the regulation's requirement that "[e]very person present at the scene of such an occasion shall comply with any necessary order or instruction of any police officer." 400 F.Supp. at 211. We disagree. The word "necessary" in this sentence of the regulation has the same meaning that it does in the preceding sentence. As there, it limits police discretion

to the accomplishment of the specified and properly narrow purposes of the regulation; it cannot reasonably be construed to authorize the police to issue orders infringing the peaceful exercise of First Amendment rights. *See Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

■ The District Court indicated that if discretion to establish lines is to be given to the police it must be done by a regulation setting out such "mechanics" as "the geographic area to be encompassed, the number of officers deployed, means of maintaining the line against assault, the duration of time which the line is to be maintained, [and] how to announce to the public the initiation of a line". 400 F.Supp. at 212. It is clear to us however that the regulation deals only with extraordinary or emergency "occasions" in which substantial factors of unpredictability exist. It cannot be known in advance, for example, how big a particular fire will be, how toxic a gas released in a particular explosion will be, or how widespread and violent a riot will be. Nevertheless, each of these factors would affect the duration, geographic extent and other "mechanics" of a given police line. We think the regulation's definition of the scope of police discretion in functional terms is reasonable, and that meticulous specificity is not required.

Finally on this phase of the case we emphasize that for the most part the purposes of the police were to afford a clearing for the movement of traffic or to exclude the public from the vicinity of a riot or disorderly gathering. The police line regulation (§§ 5a(2) and (4)) specifically authorizes such actions. Further specificity is not necessary.

## CONSTITUTIONALITY OF POLICE MASS DEMONSTRATION PROCEDURES AS APPLIED

The District Court thought that even assuming the constitutionality of the police

line ordinance and the failure-to-move-on statute the conduct of the police justified injunctive relief. In support of this conclusion the court cited (1) "the improper use of police lines and sweeps, and invocation of the failure-to-move-on statute in a manner which maximized the chance of arresting persons who were innocent of any wrongdoing", and (2) the decision in the Watergate and May Day demonstrations to suspend use of the field arrest forms and the failure otherwise to record information necessary for prosecution. 400 F.Supp. at 213.

■ The Constitution mandates that access to the streets, sidewalks, parks and other similar public places for the purpose of exercising First Amendment rights cannot be denied broadly and absolutely. *Food Employees Local 590 v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 315, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968).[3] Restrictions on the time and place of demonstrations and the conduct of demonstrators of course must not be used as a subterfuge for the suffocation of speech. It is axiomatic however that the police may, in conformance with the First Amendment, impose reasonable restraints upon demonstrations to assure that they be peaceful and not obstructive. *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); *Cox v. Louisiana,* 379 U.S. 536, 554–55, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *Hague v. C.I.O.,* 307 U.S. 496, 515–16, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). And by the same token the First Amendment permits the police to contain or disperse demonstrations that have become violent or obstructive.

■ In analyzing the constitutional propriety of the police reaction to the seven demonstrations here in issue it is important to note that the police did not interfere with the demonstrations because of the content of the message they sought to present; there is no evidence that the police hindered

---

**3.** Although the holding of the *Logan Valley Plaza* case has been overruled, *Hudgens v. N.L. R.B.,* 424 U.S. 507, 518–19, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), *citing Lloyd Corp. v. Tan-* *ner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), *its statement concerning First Amendment rights in public places remains valid.*

exercise of First Amendment rights by only certain groups or only when certain ideas were expressed and plaintiffs do not allege such discrimination. There was no violation of the principle that "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). The police were concerned with the conduct of the demonstrators, specifically their violence and obstruction of the streets. That violence and obstruction occurred was acknowledged by the District Court in its findings of fact: "[d]uring the mass demonstrations taking place in the District of Columbia in the time period 1969–1971, there were numerous instances of disruptive and destructive behaviour by persons participating in these activities." 400 F.Supp. at 208. It follows that because either obstructive conduct or actual or imminent violence infected the demonstrations in substantial measure, the First Amendment did not insulate them from restraint by way of police lines and sweeps and the application of the failure-to-move-on statute.

■ In support of its criticism of the use ·of police lines and sweeps and the invocation of the failure-to-move-on statute the court relied upon the familiar doctrine, expressed in *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), that when the government seeks to regulate activity which combines speech protected by the First Amendment with other forms of conduct the incidental restriction on First Amendment freedoms

must be no greater than is essential to the furtherance of a legitimate government interest. As we understand it the court's reasoning was that the restrictions imposed by the police were greater than necessary because they resulted in the arrest of demonstrators who were not guilty of violence or obstruction, or of bystanders who were not participants in the demonstrations. We think however the District Court's theory is unrealistic. It is the tenor of the demonstration as a whole that determines whether the police may intervene; and if it is substantially infected with violence or obstruction the police may act to control it as a unit. "[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment." *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972) [footnote omitted]. Confronted with a mob the police cannot be expected to single out individuals; they may deal with the crowd as a unit.

■ We do not suggest of course that one who has violated no law may be arrested for the offenses of those who have been violent or obstructive. As we have seen however the police may validly order violent or obstructive demonstrators to disperse or clear the streets. If any demonstrator or bystander refuses to obey such an order after fair notice and opportunity to comply, his arrest does not violate the Constitution even though he has not previously been violent or obstructive.[4]

The District Court enjoined the Police Department from "instituting mass arrests without the contemporaneous completion of field arrest forms or other administrative device or procedure for recording informa-

---

4. The District Court found that "[m]ost of the persons arrested [at the Watergate demonstration] were not engaging in any unlawful conduct." 400 F.Supp. at 195. The District Court appears to have meant that many arrestees had not been violent or obstructive. Even if this were true, however, the demonstrators could still be properly arrested for failure to obey a valid dispersal order. After the order was given, the police gave the demonstrators "several minutes" to disperse before they began to make arrests. *Id.* at 194. The District Court's

finding that "most of the persons in the rear of the crowd . . . did not hear the request to leave the area", *Id.,* gives us pause, as does the finding that "not all of the persons" at the Washington Monument incident heard the dispersal order given there. *Id.* at 198. Whatever may have been the deficiencies in the manner of ordering dispersal at these two 1970 demonstrations, however, they appear to have been eliminated by the police department's subsequent purchase of effective sound equipment. (App. 1148, 1624–25)

tion necessary to establish probable cause for the arrest." 400 F.Supp. at 218. A field arrest form records the identity of the person arrested, and the circumstances of the apprehension, including the charge, the name, unit and badge number of the arresting officer, and the identity of any other officer witnessing the arrest. After filling out the field arrest form the arresting officer is photographed with the arrested person before turning him over to an officer for transportation to a booking center. The District Court thought its injunction was justified by *Sullivan v. Murphy,* 156 U.S. App.D.C. 28, 478 F.2d 938 (1973). We cannot agree.

 In *Sullivan v. Murphy,* the plaintiffs prayed for injunctive relief against criminal prosecutions not conducted in good faith. The ground of the action was that the prosecutor had no evidence, because the police had failed to execute field arrest forms, and the prosecutions were therefore not in good faith. Plaintiffs asked that the records of their arrests be expunged. In the circumstances this court held that it could be presumed that any arrest not accompanied by a field arrest form was invalid, "this presumption being of course subject to rebuttal upon an affirmative showing by Defendants that any particular arrest was based upon probable cause." 156 U.S.App.D.C. at 57, 478 F.2d at 967 [footnote omitted]. Such a rebuttable presumption cannot justify a sweeping prohibition of any and all mass arrests without the completion of field arrest forms. Obviously, probable cause may exist even though evidence of it is not recorded at the time of arrest. As the Supreme Court put it in *Gerstein v. Pugh,* 420 U.S. 103, 113–14, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975):

a policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest.

If all members of a group are arrested the prosecutor may well be able to prove, by the testimony of policemen who were at the scene, that there was probable cause to believe that the group as a whole was violating the law by violence or obstruction, or by remaining on the scene after reasonable notice and opportunity to disperse. In short, a prosecutor in the future will be entitled to an opportunity to make "an affirmative showing" of probable cause in each case of a mass arrest, and the District Court erred in cutting off that opportunity by a blanket prohibition.[5]

## AFFIRMATIVE EQUITABLE RELIEF

As we have said, the District Court ordered the defendants to formulate a comprehensive manual specifying policies to be followed in dealing with future mass demonstrations. The court ordered that the manual be filed with the court, with a copy to be served upon counsel for the plaintiffs. In explanation of this order the court said:

The Court will not endeavor at this point to order specific changes in police procedures. Nor will the Court take upon itself the task of rewriting the department's Orders or manuals. Instead, the course followed in the *COPPAR*[6] case seems to be the most practical one. Defendants will be required to formulate a comprehensive, written plan (preferably in the form of a manual or handbook) which clearly states the policies and procedures to be followed by the department in mass demonstrations.

400 F.Supp. at 217.

The order directed that the manual "include instructions in all of those problem areas identified in the Findings of Fact."

**5.** In the cases considered by the District Court, in which the prosecutor dismissed the charges, he was unable to make any showing whatever of probable cause for the arrests. In these circumstances expungement of the arrest records was appropriate. *Menard v. Saxbe,* 162 U.S.App.D.C. 284, 290, 498 F.2d 1017, 1023 (1974); *Sullivan v. Murphy,* 156 U.S.App.D.C. 28, 58, 478 F.2d 938, 968 (1973).

**6.** *Council of Organizations on Philadelphia Police Accountability and Responsibility (COPPAR) v. Rizzo,* 357 F.Supp. 1289 (E.D.Pa.1973), aff'd sub nom. *Goode v. Rizzo,* 506 F.2d 542 (3rd Cir. 1974).

Although the judgment entered does not further identify these "problem areas" we gather from the court's findings of fact that they include (1) the excessive use of physical force by policemen in making arrests; (2) the failure or refusal by police to advise persons arrested of the specific charges against them and to give them their *Miranda* warnings; (3) unreasonable delays in the booking of prisoners and failure to release them on collateral; (4) inadequate attention to the medical needs of prisoners; and (5) various police department internal review and personnel practices.

Subsequent events have demonstrated, that the *COPPAR* case does not support the court's judgment, for the decision in that case was reversed by the Supreme Court in *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). We think the decision in *Rizzo v. Goode* requires the reversal of the court's order directing the preparation of a police manual.

The District Court here found that in some twenty-five instances individual police officers used excessive force or made groundless arrests. The court also found that when persons were arrested they were told, only upon request, that they were being charged with ˙disorderly conduct, and that *Miranda* warnings were not given to them. At the booking centers, said the court, there were long and unreasonable delays in the booking process, aggravated by the asking of "numerous personal questions which were irrelevant to the booking process." 400 F.Supp. at 214. Finally the court found that in a number of instances inadequate attention was given to the medical needs of the prisoners.

Assuming that there is support in the record for the court's findings they do not justify its order. In this case, as in *Rizzo v. Goode* :

> Individual police officers *not named as parties* to the action were found to have violated the constitutional rights of particular individuals, only a few of whom were parties plaintiff. As the facts developed, there was no affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners—express or otherwise—showing their authorization or approval of such misconduct.

423 U.S. at 371, 96 S.Ct. at 604 [emphasis in original]. There is no showing here that the defendants directed, authorized or approved the use of excessive force by the individual police officers in the incidents described by the court.[7] The defendants cannot be charged with the aberrations of a comparative handful of individual policemen in a department consisting of 5,000 members. *See Washington Free Community, Inc. v. Wilson,* 157 U.S.App.D.C. 360, 363–64, 484 F.2d 1078, 1081–82 (1973). We note further that according to the record some 300 demonstrations a year (App. 1567), many of them involving large numbers of people, take place in Washington, yet the plaintiffs and the District Court in 1975 focused on only seven demonstrations, all of which occurred in 1969–71. There is no showing that the police misconduct alleged to have occurred in 1969–71 has been repeated in subsequent demonstrations, so as to justify sweeping injunctive relief. *See O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

**7.** It is true that the court found that one defendant, Assistant Chief of Police Zanders, improperly used mace on passive demonstrators during the May Day demonstrations. The facts were, however, that Chief Zanders sprayed mace on twenty-five or thirty demonstrators who sat down in the middle of the intersection of Independence Avenue and 14th Street, S. W., thereby totally blocking the streets during the morning rush hour. Chief Zanders was the only officer on the scene. The demonstrators refused to move when requested to do so and traffic was piled up on both sides of the intersection. In this exigency the Chief resorted to the use of mace, for as he testified he had no other way to move the demonstrators. His action was contrary to police regulations concerning the use of mace. We think however that the Zanders incident furnishes no support for the court's order. Since it occurred, a more precise regulation concerning the use of mace has been included in the police manual.

The revision of the Police Department's internal review and personnel practices, ordered by the District Court, is, we think, an unacceptable "limitation on the department's 'latitude in the "dispatch of its own internal affairs." ' " *Rizzo v. Goode,* 423 U.S. 362, 379, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976).

The District Court found that some persons arrested during the various demonstrations were detained for what the court considered to be unreasonable periods of time, and that others who were injured did not receive prompt and adequate medical attention. Assuming that these findings are justified however they do not support the court's sweeping direction that the alleged deficiencies be corrected by the issuance of a manual. There was no showing that the policy of the individual defendants, or that of the Police Department, was to detain prisoners an unreasonable length of time or to deny them adequate medical treatment.

The period of detention that is "reasonable" varies with the circumstances. The record discloses that during the May Day demonstrations on May 3, 1971, 7,926 persons were arrested and on May 4, 3,438 persons were arrested.[8] Arrests in some of the other demonstrations were numbered in the hundreds. In these circumstances it is not surprising that the booking and collateral-posting process took hours instead of minutes and that in individual cases mistakes were made by the police; but it is not reasonable to extrapolate a general policy of lawlessness from such mistakes.

 Finally, we turn to the District Court's finding:

The most egregious failings during the arrest and booking process, perhaps because there could be no reasonable excuses, were the refusal to advise arrestees of the specific charges being made against them and to give them their *Miranda* warnings. This misfeasance was a denial of due process. *Feeley v. District of Columbia,* 128 U.S.App.D.C. 258, 387 F.2d 216 (1967).

400 F.Supp. at 214. We think the court's conclusion cannot be supported. In *Feeley v. District of Columbia,* upon which the court relied, we held that an information upon which a defendant is tried must specify which of several potentially applicable statutes is the basis of the prosecution. The case does not hold that a policeman making an arrest must immediately advise the prisoner of the specific section of the statute or regulation he is charged with violating. A policeman on the scene cannot be expected to assay the evidence with the technical precision of a prosecutor drawing an information. For instance, a person arrested for disorderly conduct might eventually be charged with conspiracy to riot. The District Court noted the testimony of Chief of Police Wilson that a person taken into custody during a demonstration was told that he was under arrest, and if he asked, was informed that he was charged with disorderly conduct. 400 F.Supp. at 203. We think this was all that was required; certainly it cannot be said that failure to be more specific constituted a denial of due process. As for the court's criticism of the police failure to give *Miranda* warnings at the time demonstrators were arrested, we need only to point out that such warnings are required at the commencement of "questioning initiated by law enforcement officers after a person has been taken into custody", *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). There is no showing here of any improper questioning of prisoners at the scene of their arrest and therefore there was no "denial of due process" or other constitutional violation in that regard.

The judgment of the District Court is reversed except as to Paragraph 6 pertaining to expungement of arrest records and the case is remanded for further proceedings in accordance with this opinion.

*So Ordered.*

8. So far as the May Day demonstrators are concerned, those whose avowed purpose was to clog the machinery of government were hardly in a position to complain that it worked slowly. See n. 2 *supra.*

ON SUGGESTION FOR REHEARING
EN BANC

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

### ORDER

On consideration of the suggestion for rehearing *en banc* filed by appellees, and of the supplemental memoranda filed by the parties at the direction of the Court, and a majority of the judges of this Court in regular active service not having voted in favor thereof, it is

ORDERED, by the Court, *en banc* that appellees' suggestion for rehearing *en banc* is denied.

Statement of Chief Judge BAZELON, in which Circuit Judge WRIGHT joins, as to why he voted to deny rehearing en banc.

Statement of Circuit Judge LEVENTHAL, with whom Circuit Judges WRIGHT, McGOWAN and ROBINSON join, as to why he voted to deny rehearing en banc.

Statement of Chief Judge BAZELON, in which Circuit Judge WRIGHT joins, as to why he voted to deny rehearing en banc.

Like my Brother Leventhal, I am concerned by aspects of this decision. I am particularly disturbed by the panel's holding that *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), bars the injunctive relief ordered by the District Court—the development of "a comprehensive manual specifying policies to be followed in dealing with future mass demonstrations." 184 U.S.App.D.C. at ——, 566 F.2d at 121. I believe the panel gives *Rizzo's* rule of judicial restraint too broad a reading and also disregards (in violation of F.R.C.P. 52(a)) factual findings of the District Court which take this case out of the *Rizzo* situation.

*Rizzo* held that the relief that had been ordered by the District Court violated "the settled rule that in federal equity cases 'the nature of the violation determines the scope of the remedy.'" 423 U.S. at 378, 96 S.Ct. at 607.[1] It is thus important to look carefully at the "nature of the violation" and the "scope of the remedy."

In *Rizzo* the violation consisted "of an 'unacceptably high' number of . . . incidents [of police misconduct] of constitutional dimension—some 20 in all—occurring at large in a city of three million inhabitants, with 7,500 policemen" over a one-year period. 423 U.S. at 373, 96 S.Ct. at 605.

---

1. *Rizzo* reversed the lower courts on three grounds:

(1) The Supreme Court expressed "serious doubts" about whether there was a "case or controversy between the individually named respondents and petitioners" because "the individual [plaintiffs'] claim to 'real and immediate' injury rests not upon what the named [defendants] might do to them in the future . . . but upon what one of a small, unnamed minority of policemen might do to them in the future because of that unknown policeman's perception of departmental disciplinary procedures. . . . Thus, insofar as the individual [plaintiffs] were concerned, we think they lacked the requisite 'personal stake in the outcome,' . . . i. e., the order overhauling police disciplinary procedures." 423 U.S. at 371–73, 96 S.Ct. at 605.

(2) The Supreme Court held that, by virtue of the wording of § 1983, plaintiffs lacked a cause of action on the facts found by the District Court. Plaintiffs were required to show that the named defendants were somehow actively responsible for the proven violations of other police officers; defendants' "*failure* to act in the face of a statistical pattern" of police violations was not sufficient evidence of their own wrongdoing to support a § 1983 claim against them. 423 U.S. at 376, 96 S.Ct. 598, 606.

(3) The Supreme Court held that "beyond considerations concerning the existence of a live controversy and threshold statutory liability," it was forced to reverse because the "scope of federal equity power [could not] be extended to the fashioning of prophylactic procedures for a state agency designed to minimize this kind of misconduct on the part of a handful of its employees." This conclusion was not stated as a general rule, but rested on "the facts of this case" where "the nature of the violation" was not shown to support "the scope of the remedy" and where "important considerations of federalism" also weighed against this exercise of federal equity power. 423 U.S. at 377–78, 96 S.Ct. 598, 607.

The relation of the named defendants to the constitutional violations was also important:

> Individual police officers *not named as parties* to the action were found to have violated the constitutional rights of particular individuals, only a few of whom were parties plaintiff. As the facts developed, there was no affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners [defendants below]—express or otherwise—showing their authorization or approval of such misconduct. Instead, the *sole* causal connection found by the District Court between petitioners and the individual respondents was that in the absence of a change in police disciplinary procedures, the incidents were likely to continue to occur, *not* with respect to them but as to the members of the classes they represented.

423 U.S. at 371, 96 S.Ct. at 604. "In sum," said the Supreme Court, "the genesis of this lawsuit . . . has evolved into an attempt by the federal judiciary to resolve a 'controversy' between the entire citizenry of Philadelphia and the [defendant] elected and appointed officials over what steps might . . . '[appear] to have the potential for prevention of future police misconduct'" of a sort found to be "fairly typical of [the problems] afflicting police departments in major urban areas." 423 U.S. at 371, 375, 96 S.Ct. at 604, 606. The relief ordered by the District Court in *Rizzo* involved "a comprehensive program for improving the handling of citizen complaints alleging police misconduct." 423 U.S. at 365, 96 S.Ct. at 601. This program included police notification to the public of complaint procedures, police development of a train-ing manual, police record-keeping for monitoring purposes, and continuing District Court jurisdiction to evaluate the police program and to provide further relief as needed. 423 U.S. at 365, n. 2, 96 S.Ct. 598.

The panel opinion attempts to equate this case with *Rizzo* by disregarding key findings of the District Court and by reading *Rizzo* too broadly. First, the opinion holds that some kinds of police conduct judged to be violations of plaintiffs' rights by the District Court were in fact lawful or excusable. These include unreasonable delays in the booking procedures and in the provision of medical care,[2] failure to give *Miranda* warnings, and failure to inform arrestees of the charges against them. The panel opinion then holds that the other violations found by the District Court—the use of excessive force and unlawful arrests—were not sufficiently numerous or closely enough linked to the named defendants to justify affirmative injunctive relief:

> The District Court here found that in some twenty-five instances individual police officers used excessive force or made groundless arrests. . . . There is no showing here that the defendants directed, authorized or approved the use of excessive force by the individual police officers in the incidents described by the court. The defendants cannot be charged with the aberrations of a comparative handful of individual policemen in a department consisting of 5,000 members. . . . There is no showing that the police misconduct alleged to have occurred in 1969–71 has been repeated in subsequent demonstrations, so as to justify sweeping injunctive relief.

184 U.S.App.D.C. at ——, 566 F.2d at 122 (footnote omitted).

---

2. Besides finding the booking delays to be reasonable given the number of demonstrators arrested, the panel also stated:

> The District Court found that some persons arrested during the various demonstrations were detained for what the court considered to be unreasonable periods of time, and that others who were injured did not receive prompt and adequate medical attention. Assuming that these findings are justified how-ever they do not support the court's sweeping direction that the alleged deficiencies be corrected by the issuance of a manual. There was no showing that the policy of the individual defendants, or that of the Police Department, was to detain prisoners an unreasonable length of time or to deny them adequate medical treatment.

184 U.S.App.D.C. at ——, 566 F.2d at 123.

I question the panel's conclusion that the District Court incorrectly found violations of plaintiffs' rights in the alleged booking delays, inadequate medical care, and failure to give *Miranda* warnings.[3] But even if the District Court erred as to these matters, I believe that its unchallenged findings that the police used excessive force and made unlawful arrests provide more than sufficient grounds for the injunctive relief it ordered, *Rizzo* notwithstanding.

Unlike *Rizzo* and contrary to the panel's suggestion, this case does not concern isolated incidents of police acting individually in various law enforcement situations. The record of police misconduct established here pertains only to a particular situation and a discrete group of officers—the handling of mass demonstrations by the police Civil Disturbance Unit (CDU) consisting of 650 policemen and the Prisoner Control Center (PCC) personnel. The District Court found numerous instances of excessive police force in virtually every demonstration it examined for 1969–1971[4] (subsequent demonstrations were not examined because no mass arrests—the subject of this lawsuit—occurred after 1971). The court made plain that the instances it detailed were not meant to be an exhaustive list, but were merely "representative" of the evidence of misconduct it heard. 400 F.Supp. at 192 n. 8. Large numbers of illegal arrests caused by the failure of the police to give adequate notice of an order to disperse were also found by the District Court,[5] in addition to

---

**3.** The District Court found that release of arrestees was delayed up to 9 or more hours not only because of the large numbers involved, but also because of "an apparent breakdown in police administration," 400 F.Supp. at 196; because the police unnecessarily required that arrestees answer "a barrage of questions of a personal and extraneous nature," *id.*; because officers refused arrestees permission to use available phones to call attorneys, *id.*; and because attorneys were "thwarted in their efforts to speak to or advise those persons still incarcerated," *id.* at 197. *See also id.* at 214–15. The District Court expressly noted that unnecessary delays occurred after the Watergate demonstration, the Washington Monument incident, and the May Day demonstrations. The court attributed the police department's inefficiency to deliberate policies as well as to "inconsistent or non-existent instructions." *Id.* at 207, 214. During the May Day demonstrations, Chief Wilson personally ordered a halt to the procedure of allowing arrestees to post collateral for quick release rather than undergoing arraignment; this was for the purpose of keeping the demonstrators in jail and off the streets as long as possible. *See Dellums v. Powell,* No. 75–1974, 184 U.S.App.D.C. —, 566 F.2d 167 (1977), Tr. 2645–46, J.A. 1604–05 (the panel took judicial notice of the record in *Dellums, see* 184 U.S.App.D.C. at — n. 2, 566 F.2d at 115 n. 2). *See also Sullivan v. Murphy,* 156 U.S.App.D.C. 28, 38 n. 20, 41, 478 F.2d 938, 948 n. 20, 951 (1973).

Similarly, the District Court noted numerous incidents of delayed or inadequate medical care, 400 F.Supp. 196, 198, 207, 215, and attributed defendants' tardiness to police policies, *id.* at 207 n. 57.

The panel held that the police were not required to give *Miranda* warnings because there was "no showing here of any improper questioning of prisoners at the scene of their arrest." 184 U.S.App.D.C. at —, 566 F.2d at 123. But as the panel recognized, *Miranda* requires warnings be given "at the commencement of 'questioning initiated by law enforcement officers after a person has been taken into custody.'" *Id.* The District Court found that there was extensive questioning at the booking centers. 400 F.Supp. at 196, 214. In fact, release was made contingent on answering these questions. *Id.* The District Court also found that the police failed to give *Miranda* warnings "during the arrest and booking process," *id.* at 214, not just at the scene of the arrests. The plaintiffs' rights thus seem to have been clearly violated.

**4.** *See, e. g.,* 400 F.Supp. at 192 (beating of a "[c]learly identified" medic by various officers at Dupont Circle demonstration); *id.* at 193 n. 11 (police striking demonstrators without provocation at Three Sisters Bridge demonstration); *id.* at 195 ("numerous incidents" of police beating demonstrators with batons and inflicting injuries; also "a pervasive pattern of lack of restraint by police" and many arrests "effectuated with a level of force far in excess of that required" at Watergate demonstration); *id.* at 198 (numerous persons beaten by police with batons at Washington Monument incident; *id.* at 199–200 (arrestees choked by police batons; tear gas projectiles used as offensive weapons; various beatings by police at American University demonstration).

**5.** The District Court found that at the Watergate demonstration, the police failed to give the crowd either adequate notice to disperse or sufficient time to clear the streets before making arrests. (The panel opinion recognizes that arrests for refusal to obey a dispersal order are illegal if not accompanied by "fair notice and opportunity to comply." 184 U.S.App.D.C. at

some dispersal orders which it found lacked justification.[6]

In each of these demonstrations, *large numbers of police were acting under the direct supervision of their superiors, who either knowingly tolerated their misconduct or actually participated in it.* Chief Wilson (a named defendant) directed the police at the Dupont Circle demonstration, 400 F.Supp. at 192; Lieutenant Watson "supported" the arrests of heckling bystanders who were neither violent nor obstructive nor within a crowd of demonstrators at the Three Sisters Bridge demonstration, *id.* at 193; Deputy Chief Owen Davis (commander of the CDU and a named defendant) directed the police at the Watergate demonstration where many illegal arrests occurred following inadequate police notice to the crowd to disperse, and Chief Wilson arrived after the arrests and police beatings began, *id.* at 194; Chief Wilson directed the police at the Washington Monument incident, where the police failed to give adequate notice to disperse and used excessive force in making many arrests, *id.* at 197–98; Chief Wilson at the Georgetown demonstration ordered a police sweep resulting in mass arrests, which the District Court found to be without justification, *id.* at 198–99; both Chief Wilson and Deputy Chief Davis were in command at the American University demonstration, marked by police beatings and misuse of tear gas initiated on their orders, *id.* at 200. The District Court found that "not a single formal disciplinary action was taken against any officer involved in the demonstrations considered in this case." *Id.* at 205. The Court also found that various directors of the CDU were themselves ignorant of the Unit's policies. *Id.* at 204 & n. 39. These findings of the District Court amply support its crucial factual conclusion that

"many examples of misconduct by CDU and PCC officers were the *direct result* of policies and procedures authorized by defendants and of defendants' failure adequately to train, supervise and coordinate the activities of subordinates." *Id.* at 208 (emphasis added).

It is also relevant that the relief ordered by the District Court did not run the risk of an open-ended federal court supervision of the police department, as in *Rizzo,* but instead simply required the defendants to formulate "a comprehensive, written plan (preferably in the form of a manual or handbook) which clearly states the policies and procedures to be followed by the police department in mass demonstration situations . . . ." 400 F.Supp. at 219.

There is a final basis for distinguishing *Rizzo* not addressed in the panel opinion. *Rizzo* involved violations of individuals' fourth amendment and equal protection rights; the nature of those rights and of the police illegalities did not suggest that plaintiffs would be deterred from freely exercising their rights in the future or otherwise inhibited in the absence of injunctive relief. The present case concerns police misconduct in the handling of mass demonstrations; here, there is likely to be a chilling effect on individuals' protest activities unless the police are restrained from similar misconduct in the future. Illegal arrests and excessive force may deter peaceful and law-abiding citizens from exercising their first amendment rights, especially if they cannot be confident that they will be given a chance to disperse before mass arrests and police beatings take place. For those who are not deterred and are unlawfully arrested, the opportunity for speech will have been lost, sometimes irretrievably, even though prosecutions are later dis-

---

——, 566 F.2d at 120.) The District Court also noted that the police used police lines to push crowds and cut off groups of people, who were then charged with violating a police line. The Assistant Corporation Counsel testified that this was not "a proper charge." 400 F.Supp. at 194–97. Adequate notice to disperse was also found lacking at the Washington Monument incident. *Id.* at 197–98.

6. The District Court found that the defendants failed to justify the use of police lines to sweep the Washington Monument grounds, 400 F.Supp. at 198, and to sweep Wisconsin Avenue during the Georgetown demonstration, *id.* at 198.

missed, arrest records are expunged and individual damage actions are successful. It is these evils that have led the Supreme Court consistently to condemn prior restraints in other forms and contexts. *See New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

Hence, in this situation more than any other, police misconduct should be minimized to the greatest extent possible. The best ways to do that are through proper training and careful on-the-spot supervision. In the relief it ordered, the District Court wisely avoided trying to mandate the second of these approaches. Its orders requiring defendants to develop coherent policies in a form communicable to lower level officers followed the first of these approaches in the least intrusive manner possible. Although I agree with Judge Leventhal that the proposed police manual may not be able to guarantee appropriate police behavior when "coping with a massive shutdown effort," this limitation is no justification for vacating the District Court's order. Without written policies, there is even less hope that the Civil Disturbance Unit will avoid these same errors in the future, or that it will adhere to the limitations carefully imposed by the panel on the use of the failure-to-move-on statute [7] and the police line ordinance.[8] Assuming there are future mass demonstrations, the unfortunate result may well be more illegal mass arrests, more unjustified interruptions of first amendment activities, and more lawsuits.

For all these reasons, I would ordinarily vote to rehear this case en banc. However, Judge Leventhal relies on the presence of a new police chief and the police department's new "low-key approach" to reach

---

7. The Failure-to-Move-On Statute, 22 D.C.Code § 1121(2), makes it a criminal offense to "congregate . . . with others on a public street and refuse . . . to move on when ordered by the police . . . ." The offense also requires that a "breach of the peace" be intended by the individual or be probable under the circumstances.

Under the panel's interpretation, the police may order demonstrators to move on only in two situations: (1) when "a substantial risk of violence is present," 184 U.S.App.D.C. at ——, 566 F.2d at 116 or (2) when the demonstrators are obstructive, *id.* at ——, 566 F.2d at 116. In the first situation, the demonstrators as a group cannot be ordered to disperse unless the demonstration is "substantially infected with violence." *Id.* at ——, 566 F.2d at 120. If it is not, the police must deal with unruly demonstrators individually. In the second situation, "the initial police objective [in ordering obstructive demonstrators to move on] must be merely to clear passage [for vehicular traffic through streets or pedestrian traffic into public buildings], not to disperse the demonstrators, or to suppress the free communication of their views." *Id.* at ——, 566 F.2d at 116 (emphasis added). As the panel warned, "the Constitution mandates that access to the streets, sidewalks, parks and other similar public places for the purpose of exercising First Amendment rights cannot be denied broadly and absolutely." *Id.* at ——, 566 F.2d at 119.

Only if the police order satisfies these requirements, and only if the police provide demonstrators "fair notice and opportunity to comply," *id.* at ——, 566 F.2d at 120, is an arrest for refusing to move on lawful.

8. As construed by the panel, the Police Line Regulation also gives the police rather narrowly circumscribed power. Although the regulation on its face permits the use of police lines whenever the supervising officer deems them necessary, the panel opinion—to save the regulation from vagueness because of its seeming grant of excessive discretion to the police—interprets the word "necessary" as an objective standard:

Any police line must be 'necessary' to achieve one of three basic purposes: (1) clearing the way for the operation of firemen or policemen, a parade or the movement of traffic; (2) excluding the public from the vicinity of 'a riot or disorderly gathering, accident, wreck, explosion or other emergency'; or (3) the protection of persons and property. . . . [The word 'necessary'] limits police discretion to the accomplishment of the specified and properly narrow purposes of the regulation; it cannot reasonably be construed to authorize the police to issue orders infringing the peaceful exercise of First Amendment rights.

184 U.S.App.D.C. at —— ——, 566 F.2d at 118–119.

It should be noted that the panel opinion does not consider whether persons may be arrested and charged with violating a police line when that line is moving or when officers break ranks and chase individual demonstrators. *See* 400 F.Supp. at 197 (testimony of assistant corporation counsel that these are not proper charges).

the hopeful conclusion that "recurrent problems" are not likely to occur. This conclusion, as a matter of "self-denying discretion," disinclines him at this time to engage the court's energy in clarifying the panel's interpretation of *Rizzo*. Since four other judges of this court thus narrowly confine the precedential value of the panel's decision to the particular circumstances acknowledged in Judge Leventhal's statement, I join my colleagues in voting to deny a rehearing en banc.

Statement of Circuit Judge LEVENTHAL, with whom Circuit Judges WRIGHT, McGOWAN and ROBINSON join, of

Reasons for Voting to Deny Rehearing En Banc

LEVENTHAL, Circuit Judge:

This is another instance in which it is well to remind all concerned that a vote to deny rehearing en banc does not necessarily connote agreement with the decision as rendered.

There are various respects in which the panel decision may be questioned, yet in which its impact for the future is difficult to discern. Take, for example, the ruling that there may be mass arrests for failure to disperse or clear the streets in the wake of a police order issued to cope with violent or obstructive demonstrations. The panel decision acknowledged difficulty with such a proposition when a large number of persons involved did not hear the dispersal order. Our ruling in *Dellums v. Powell*, 184 U.S.App.D.C. ——, 566 F.2d 167 ( # 75–1974) issued August 4, 1977, makes it clear that there cannot be valid arrests in the absence of reasonable belief that the order was heard, and that even a supervising official may render himself liable in damages for ordering arrests under conditions supporting a jury verdict negativing good faith belief that the order was widely heard. The problem is bypassed in the panel's opinion with the comment that it may have been eliminated by the police department's subsequent purchase of effective sound equipment.

Again, the panel opinion applied the *Rizzo* doctrine [1] to reverse the decree requiring the police to formulate a comprehensive manual specifying policies to be followed in dealing with future mass demonstrations. A serious question as to applicability of *Rizzo* arises when the police misconduct involves not merely, as in *Rizzo*, 20 instances of police misconduct, of a sort found to be "fairly typical of [the problems] afflicting police departments in major urban areas," [2] but a district court finding of numerous instances of excessive police force during 1969–1971, with the instances it detailed being merely "representative" of the evidence of misconduct.[3] And the pending case presented evidence of either participation by the police chief and supervising officials or knowing toleration of misconduct.

On the other hand, the events of May 1971—when matters were carried to extremes—may have put a retrospectively adverse cast on prior developments. Prior to "May Day" 1971 there were both new problems of mass demonstration, and responsible efforts by the police and the community to grapple with them—including the evolution of the field arrest form procedure. When matters became egregious, however, the police were confronted not with the relatively predictable problem of a sprawling demonstration going out of hand but with what seemed to be a new problem of a threat to shut down the government. A manual can be of enormous help in avoiding the spread of conflagrations, but coping with a massive shutdown effort, if perceived, must in the last analysis rest on perception, judgment and good faith. This is not a reason to forego a manual or directives, but an awareness that one may be approaching the limit of utility of such a technique.

**1.** *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

**2.** 423 U.S. at 375, 96 S.Ct. at 606.

**3.** *Washington Mobilization Committee v. Cullinane*, 400 F.Supp. 186, 192 n. 8 (D.D.C.1975).

Overall, the question persists whether the problems identified by the district court's findings of excessive police force in the 1969–1971 period are of a recurring nature. Almost six years have passed since the last mass arrest and three years since the trial. A new police chief has had the benefit of reflection concerning what was done in the past and what the courts have said about those incidents. The police department has manifested an attitude of low-key avoidance of confrontation.[4] This is not said as a matter of proof at trial, but a perception affecting discretion and judgment.

If the police had issued a formal directive of reconsideration, we would have no hesitation in dispensing with affirmative judicial relief without prejudice to future complaints—in the court if other agencies of government are unresponsive—in the event grievances recur. So much is established by *Washington Free Community, Inc. v. Wilson*, 157 U.S.App.D.C. 360, 484 F.2d 1078 (1973), which did not turn on jurisdictional mootness, but on prudential considerations, put by Judge McGowan as reasons for "self-denying discretion" (at 364, 484 F.2d at 1082).

Whether to exercise en banc discretion is particularly likely to turn on whether recurrent problems are visualized. With indications that the police department has been advancing in its low-key approach, and with the reasonable expectation that it will reflect on the various decisions involving mass arrests, it makes sense on prudential grounds to let the smoke clear so far as the court en banc is concerned.

---

4. We are aware that since 1971 there have been no mass demonstrations of the kind that developed during 1969–1971. But there have been some demonstrations of substantial size. Our perception is that a relatively low-key police approach has not been immaterial to the result, avoidance of ugly confrontation.