Donato DALRYMPLE,
et al., Plaintiffs,

v.

Janet RENO, Individually and
in her personal capacity,
et al., Defendants.

No. 00–1773–CIV–MOORE.

United States District Court,
S.D. Florida.

Oct. 1, 2001.

Larry Elliot Klayman, Washington, DC, for plaintiff.

Nina S. Pelletier, Trial Attorney, U.S. Department of Justice, Washington, DC, for defendant.

## *ORDER*

K. MICHAEL MOORE, District Judge.

This cause is before the Court upon Defendants' Motion to Dismiss.[1] Upon consideration of the motion and opposition, the Court enters the following Order.

### I. *Background*

This case stems from the custody dispute over six-year old Elian Gonzalez between his father Juan Miguel, a Cuban National, and his great-uncle Lazaro Gonzalez, an American citizen.[2] Elian's Uncle Lazaro sought INS asylum on Elian's behalf, but against his father's wishes. The INS refused to consider the petition because of the father's intention to return to Cuba with Elian. When Lazaro and his family refused to relinquish physical custody over the child, INS authorities obtained

---

1. DE # 19.

2. Neither party involved in the underlying custody and asylum proceedings are parties to the present action.

an administrative warrant for his arrest and a search warrant to gain entry into the Gonzalez's home. Plaintiffs herein were outside of the Gonzalez home when the INS agents arrived to retrieve Elian: most had gathered to demonstrate their support for Elian and their disagreement over the INS decision; eight of them were neighbors or passers-by.

On April 22, 2000, INS agents executed the warrant and extracted Elian from the house. The Amended Complaint alleges that shortly after 5:00 a.m. on April 22, a convoy of vehicles pulled up to the Gonzalez's home. "[A]gents immediately began indiscriminately spraying gas to immobilize, restrain and suppress" the crowd around the house and directly behind the barricade. The agents purportedly sprayed gas continually throughout the raid,[3] shouted obscenities, and threatened the crowd with their weapons. Thirty-three of the Plaintiffs allege that when the raid began, they tried to get closer to the Gonzalez's house. All Plaintiffs were sprayed by gas. Some Plaintiffs were physically restrained by agents, ordered to stay still, and held at gun-point. Twenty Plaintiffs retreated from the area in order to seek safety. None of the Plaintiffs were arrested or otherwise detained beyond the raid. Plaintiffs all allege that they suffered substantial injuries from the gas attack.

Plaintiff Dalrymple was inside the Gonzalez' home that morning. When agents entered the house, Dalrymple grabbed Elian and ran to a room in the back of the house. Agents entered the room by force. One agent pointed a gun at Dalrymple and instructed him to hand over the boy. An-

other agent took the child from Dalrymple, and the agents exited the house.

The Defendants are Attorney General Janet Reno, Deputy Attorney General Eric Holder, and Immigration and Naturalization Service Commissioner Doris Meissner; they are being sued in their individual capacities. Plaintiffs allege that Reno orchestrated the raid "from a small, private office at the U.S. Department of Justice's headquarters in Washington, D.C., surrounded by about a dozen people, including Meissner and Holder."[4] Before ordering the raid, Reno allegedly polled these surrounding officials: "Reno reportedly pointed to each one in turn and asked for their thoughts. Everyone, including Meissner and Holder, reportedly agreed to commence the raid."[5] Plaintiffs claim that Reno

ordered the raid, and Meissner and Holder knew of, agreed to, approved of and/or acquiesced in the raid, despite knowing and intending that: (1) a strike force of 151 heavily-armed federal agents, consisting of 131 INS agents and 20 U.S. Marshals, would be unleashed on the Gonzalez family's home and neighborhood; (2) peacefully assembled supporters would be sprayed with gas for having assembled and expressed their support for Elian and the Gonzalez family, and to prevent them from continuing to do so; and (3) neighbors, supporters and passers-by would be gassed, restrained, beaten, threatened and put in immediate fear for their lives and liberty.[6]

Plaintiffs speculate that the raid "had been carefully-planned and rehearsed for nearly

---

**3.** Throughout Plaintiffs' pleadings they characterize the events of April 22, 2000 as a "raid." The Court recognizes this characterization as an allegation, presumed true for purposes of this Order only.

**4.** Amended Complaint, ¶ 100.

**5.** The other officials are not named in the Amended Complaint, nor are they parties to this action.

**6.** Amended Complaint, ¶ 108.

two weeks."[7] Plaintiffs allege that Defendants knew the raid as planned would infringe upon the constitutional rights of Plaintiffs, whose presence was actually known to Defendants: in the weeks preceding the raid, barricades had been erected across the street where "hundreds, if not thousands of persons, including many of Plaintiffs, had assembled peacefully"[8] to demonstrate and protest. Also, the INS maintained daily surveillance of the Gonzalez home.

The Amended Complaint contains three Counts: forty-three Plaintiffs allege violation of their freedoms of assembly and expression as guaranteed by the First Amendment; twenty-five Plaintiffs assert violations of their rights to be free from unreasonable seizures as guaranteed by the Fourth Amendment; and all fifty-two claim deprivation of their liberty interest of personal security provided by the Fifth Amendment's due process clause. The Amended Complaint alleges that Defendants intentionally[9] violated Plaintiffs' rights by sending 151 armed agents to execute the warrant and seize Elian. Plaintiffs claim that Defendants directed the raid to be conducted in a manner so as to interfere with Plaintiffs' freedom of expression, condoning Plaintiffs' unreasonable seizure, and subjecting them to excessive force.[10] Plaintiffs attack the validity of the underlying warrant, contending that Defendants directed the warrant's issuance "to provide a false legal pretext for a paramilitary raid on the Gonzalez family's

home and neighborhood, which the Defendants were jointly planning."[11]

## II. Motion to Dismiss Standard

Dismissal of the complaint for failure to state a claim is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). On a motion to dismiss, the Court must accept as true all alleged facts, and must further view all inferences from those facts in the light most favorable to the plaintiff. *See Hunnings v. Texaco, Inc.,* 29 F.3d 1480, 1483 (11th Cir.1994). The Court need not, however, accept factual claims that are internally inconsistent, conclusory allegations, unwarranted deductions, or mere legal conclusions asserted by the plaintiff. *See Campos v. INS,* 32 F.Supp.2d 1337, 1343 (S.D.Fla.1998). "When, on the basis of a dispositive issue of law, no construction of the factual allegations of a complaint will support the cause of action, dismissal is appropriate." *Id.*

In their Motion to Dismiss, Defendants aver that Plaintiffs have failed to plead facts establishing a sufficient connection between the Defendants personally and any wrongful conduct. Defendants assert entitlement to qualified immunity. They argue that the Amended Complaint does not allege facts showing that Plaintiffs suffered a constitutional injury, and if they

---

7. Amended Complaint, ¶ 109.

8. Amended Complaint, ¶ 110.

9. The Amended Complaint attributes to the Defendants each and all possible levels of culpability: "maliciously, willfully, and knowingly, and with specific intent to deprive Plaintiffs of their constitutional rights, and/or with deliberate indifference to Plaintiffs' constitutional rights." Amended Complaint, ¶ 191, 197, 204.

10. Counts II and III both assert allegations that the agents used excessive force against the Plaintiffs. Count II asserts claims which arose in the context of the Fourth Amendment, pursuant to a seizure; Count III asserts the due process claims of those Plaintiffs who were not seized.

11. Amended Complaint, ¶ 82.

did suffer such an injury, it was not clearly established at the time. The Court addresses each argument in turn.

### III. Supervisor Liability

■ Plaintiffs assert claims against Defendants Reno, Holder, and Meissner personally for their participation as supervisors to the agents who conducted the raid. Supervisory liability requires allegations of a causal connection between the actions of the supervisor and the alleged constitutional deprivation. *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir.1999). Plaintiffs aver that Defendants personally directed and ordered the raid, and that the INS agents conducted the raid exactly as ordered. Plaintiffs assert that before ordering commencement of the raid Reno polled those around her, including Defendants Holder and Meissner, for their approval.

Plaintiffs rely on *Ford v. Byrd*, 544 F.2d 194, 195 (5th Cir.1976) for the proposition that a supervisor may be liable for his approval of constitutional violations committed by his subordinates. However, there is no allegation that either Meissner or Holder supervise the Attorney General or were acting in a supervisory capacity when the contested order was given. Only Defendant Reno is alleged to have exercised any authority in ordering the raid.

■ The only conduct personally attributable to Defendants Meissner and Holder occurred in the context of the underlying custody dispute, which is irrelevant to the events giving rise to the constitutional deprivations asserted herein.[12] Plaintiffs

have failed to plead facts from which Defendants Meissner and Holder could be liable for depriving Plaintiffs of their constitutional rights. Accordingly, the Amended Complaint will be dismissed without prejudice to the extent applicable against Defendants Holder and Meissner.

### IV. Constitutional Allegations

Before considering Defendant Reno's entitlement to qualified immunity, the Court must first determine whether Plaintiffs' constitutional rights were violated by her alleged conduct. The Supreme Court has instructed that "the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." *County of Sacramento v. Lewis*, 523 U.S. 833, 842 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (*citing Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)).[13] To resolve the immunity question first would perpetuate a state of uncertainty in the law. *Id.* Accordingly, the Court must first determine whether the facts alleged show that Defendant Reno's actions deprived the Plaintiffs of any statutory or constitutional rights before considering whether those rights were clearly established on April 22, 2000. *See Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

#### A. First Amendment

■ Plaintiffs were engaging in protected speech in a traditional public forum

---

12. For example, INS Commissioner Meissner is charged with refusing to consider the child's asylum request; and all three Defendants are accused of cooperating with the Cuban government "to thwart the boy's attempts to obtain political asylum." Plaintiffs accuse the individual Defendants with responsibility for directing issuance of the arrest warrant.

13. Justices Breyer and Stevens expressed doubt that such inquiry is required in all cases, particularly those cases in which the parties have not adequately presented the constitutional issues. *See Lewis*, 523 U.S. at 858, 118 S.Ct. 1708 (maintaining that it is the normal procedure for a court to decide a case on the grounds apparently offering the most direct and appropriate resolution).

by demonstrating in front of the Gonzalez's house the morning of the raid. *Perry Educ. Ass'n v. Perry Local Educs. Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). The First Amendment prohibits the government from censoring all communicative activity in a public forum, *see id.;* nonetheless, the state may regulate the time, place, and manner of expression, provided that such regulation is content-neutral, supported by a substantial government interest, and leaves open ample alternative channels for communication. *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Crowder v. Housing Auth. of Atlanta,* 990 F.2d 586, 590 (11th Cir.1993).

■ Forty-three Plaintiffs allege that they were targeted for exercising their First Amendment rights. They were assembled behind the barricade to pray and to demonstrate their support for Elian and the Gonzalez family, and to express their view that Elian should be allowed to remain in the United States.[14] Plaintiffs allege that immediately upon their arrival at the scene, agents "began indiscriminately spraying gas to immobilize, restrain, and suppress persons who had assembled peacefully behind the barricade" among others, such as neighbors and members of the media.[15] Defendants urge the Court to reject Plaintiffs' assertion that they were treated any differently from other groups and subjected to adverse action on the basis of their views. Defendants argue that Plaintiffs' allegations belie their theory that the were targeted on account of

their views, because they acknowledge that the agents went beyond the group collected behind the barricade and randomly doused the neighborhood with gas.[16] However, Plaintiffs have not plead themselves out by alleging that the agents were over-inclusive; indeed, it is entirely consistent with Plaintiffs' other accusations. Plaintiffs contend that the agents simply assumed that everyone in sight was a supporter of the Gonzalez family, protesting the INS decision.[17]

Plaintiffs accuse Defendant Reno of ordering the interruption of their demonstration because of the content of their expression. Such an allegation will defeat Defendants' Motion to Dismiss on this Count. *See Police Department of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Blackston v. State of Alabama,* 30 F.3d 117, 120 (11th Cir. 1994) (refusing to dismiss allegation that the state directed restriction against plaintiffs because they expressed grievances against the state). *Cf. Redd v. City of Enterprise,* 140 F.3d 1378 (11th Cir.1998). Defendant's assertion that the raid was a permissible time, place and manner restriction relies on facts not contained in the Amended Complaint and accordingly is beyond the scope of the Court's consideration on a motion to dismiss.

### B. Excessive Force

Plaintiffs' allegations of excessive force contained in both Counts II and III arise from Reno's decision to "unleash shock troops" in the little Havana neighborhood.

---

14. Plaintiffs' Memorandum of Opposition, at 59.

15. *Id.* at 58.

16. See Defendants' Motion to Dismiss, at 24.

17. Nor does the allegation that the agents restricted eight nonparticipant bystanders bolster Plaintiffs' contention that the restriction was greater than necessary. *Washington Mobilization Committee v. Cullinane,* 566 F.2d 107, 120 (D.C.Cir.1977) (rejecting district court's reliance on the arrest of nonparticipants in finding that police action impermissibly restricted demonstrator's First Amendment rights; police may control the demonstration and are not expected to single out individuals).

Plaintiffs aver that the raid as ordered could not have been conducted without interfering with Plaintiffs' rights. Accordingly, in both Counts, Plaintiffs contend that the relevant quantum of force, which they allege was clearly excessive, is the potential inherent in 151 armed officers. This argument ignores Plaintiffs' burden to demonstrate that the force actually applied was excessive under the circumstances. Defendant will not be liable for creating a dangerous situation unless Plaintiffs allege that the danger was realized, and that they suffered a constitutional injury therefrom. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986); *see also Robinson v. City of St. Charles, Missouri,* 972 F.2d 974, 977 (8th Cir.1992) (rejecting claim against City where plaintiffs failed to evidence violation of their constitutional rights by the individual officers). Plaintiffs must plead facts showing that their rights were actually suspended; it is insufficient for Plaintiffs to allege the Defendants *intended* to cause them harm. *See, e.g., Heller,* 475 U.S. at 799, 106 S.Ct. 1571 ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the [Defendant] might have *authorized* the use of constitutionally excessive force is quite beside the point.").

Plaintiffs' allegations of excessive force are subject to two different analyses: those Plaintiffs who were seized are entitled to the protection afforded by the Fourth Amendment, and their claims are accordingly governed by the "objectively reasonable" standard. *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("*All* claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonable-ness' standard, rather than under a 'substantive due process' approach"). The remaining Plaintiffs are limited to the protection of the Fifth Amendment and must allege that Defendant engaged in conscience-shocking conduct that deprived Plaintiffs of due process of law. *Id.*

### 1) Count II: Fourth Amendment

The Fourth Amendment Plaintiffs' claims are contained in the following allegations:

Defendants, acting under color of federal authority, personally directed and authorized the paramilitary raid on the Gonzalez' home and neighborhood, and/or had actual knowledge of and acquiesced in the raid, in a manner that imposed substantial and complete restrictions on Plaintiffs' liberty of movement and otherwise resulted in Plaintiffs being restrained by use of physical force and show of authority, without probable cause or other legal justification.

These actions by federal agents, under the personal direction of Defendants, and/or with the knowledge and acquiescence of Defendants, directly and foreseeably resulted in the unlawful and unreasonable seizure of Plaintiffs' persons, among other violations of the Fourth Amendment.[18]

Plaintiffs seeking vindication of their Fourth Amendment rights must allege facts showing that they were seized, and that such seizure was unlawful. Plaintiffs rely primarily on their contention that the warrants, which were obtained for Elian's arrest and authorized entry into the Gonzalez's home, were invalid; as such, their warrantless seizure was unreasonable, and the use of any force presumptively excessive. However, Plaintiffs' assertion that the warrant was invalid has been

18. Amended Complaint, ¶¶ 195–96.

resolved by the Court's Order of June 6, 2001 in Case No. 00–3621–CIV–HIGHSMITH, wherein Judge Highsmith found that the warrant was sufficiently supported and properly issued. The Court adopts in full Judge Highsmith's findings, negating the necessity for further consideration of the legality of the warrant.

Twenty-five Plaintiffs contend that they were illegally seized, some by the actual application of force, others under the threat of force: agents purportedly struck Plaintiffs with their weapons, held them at gun point, grabbed and pulled them away from the Gonzalez home, pushed them back behind the barricade and sprayed them with gas. All but two of these Plaintiffs advanced towards the Gonzalez home when the agents arrived. At least two actively attempted to interfere with the agents as they entered the house.

■■■ A "seizure" implicating the Fourth Amendment's protection occurs when a government actor restrains the liberty of a citizen "by means of physical force or show of authority." *Terry v. Ohio*, 392 U.S. 1, 20 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Initially, the Court must reject the claims of those Plaintiffs who were not seized: five Plaintiffs allege that they left the scene after being confronted by agents.[19] These Plaintiffs could not prove any set of facts, consistent with their allegations, showing that their liberty was actually restrained; accordingly, their claims will be dismissed.

■■■ Defendant relies on *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), and asserts that

none of the Plaintiffs were seized within the meaning of the Fourth Amendment. Plaintiffs have distinguished their claims from *Hodari* by alleging that each of them was subjected to some application of force and that they yielded to that force. A reasonable person would not believe that they were free to leave while being held at gun point, or after being ordered to lie still by a law enforcement officer; the Amended Complaint alleges that the Fourth Amendment Plaintiffs were subjected to such a show of force.[20] The allegations contained in Count II, as to the remaining Plaintiffs, sufficiently plead that they were seized.

Seizure alone does not entitle Plaintiffs to relief; they must further allege facts showing that the seizure was unreasonable. *See Brower v. County of Inyo*, 489 U.S. 593, 599, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). Plaintiffs contend that Reno ordered and intended that Plaintiffs be subjected to the alleged seizure. Alternatively, Plaintiffs assert that Reno was deliberately indifferent to Plaintiffs rights when she made the decision to send 151 armed troops into a peaceful neighborhood. The raid as it was ordered could not, Plaintiffs suggest, have been executed without interfering with Plaintiffs' rights, and Reno incurred liability to them upon issuing the order. Plaintiffs' theories differ only in the state of mind they attribute to Reno's actions. Under either theory, Plaintiffs allege that Reno's decision to cause their seizure was made in the absence of any justification.

---

**19.** Eva Espinosa, ¶ 148; Triburcio Estupinan, ¶ 149; Jose I. Garcia, ¶ 152; Ledia Betancourt Garcia, ¶ 153; Rosa Garcia, ¶ 154.

**20.** Plaintiffs will ultimately bear the burden of proving not only that they submitted to the agents' authority, but that the agents intended to physically restrain the Plaintiffs. *See Brow*

*er v. County of Inyo*, 489 U.S. 593, 598, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989); *Hicks v. Leake*, 821 F.Supp. 419, 421 (W.D.Va.1992) ("specific intent to restrain must be alleged and proven in order to establish a claim for an excessive force violation of the Fourth Amendment").

Whether the force used to effectuate a particular seizure is excessive requires a comparison of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (internal quotation marks omitted). Where, as in the present case, Plaintiffs were allegedly exercising their First Amendment rights of freedom of expression and of assembly, "the requirements of the Fourth Amendment must be applied with scrupulous exactitude." *Zurcher v. Stanford Daily,* 436 U.S. 547, 564, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978).

 Excessive force claims are evaluated for objective reasonableness based on the information the officers had when the contested conduct occurred. *See Graham,* 490 U.S. at 396, 109 S.Ct. 1865. Plaintiffs allege that the raid was conducted exactly as planned and intended; the relevant inquiry then would be whether the force used was excessive in light of the information known to Reno when she directed commencement of the raid. Plaintiffs contend that Reno choreographed the raid from a detached site and determined the amount of force to be used before the agents were even deployed. According to Plaintiffs, at the time that the decision was made, Defendant allegedly lacked knowledge of any facts that would justify Plaintiffs' seizure: Reno purportedly knew only that Plaintiffs were present, and that they were demonstrating their disagreement with the government's actions. Accordingly, Plaintiffs argue, it is not relevant that they moved closer to the house.

 Defendant avers that the reasonableness of the agents' conduct is evidenced by the number of persons they confronted on the scene and the fact that half of those present tried to get closer or directly interfere. Likewise, Plaintiffs aver that the excessiveness of the force employed may be determined from the following facts: the number of armed agents assigned to conduct the raid; the extent of the injuries sustained; and the absence of any need to use force to suppress the crowd. The Constitutionality of the officers' conduct must be determined upon examination of the tenor of the demonstration as a whole. *Washington Mobilization Committee v. Cullinane,* 566 F.2d 107, 120 (D.C.Cir.1977). Plaintiffs generally aver that they were peacefully assembled. The single fact that some tried to get closer does not demonstrate a threat sufficient for the Court to decide that the force applied was reasonable as a matter of law.

Finally, Defendant argues that Plaintiffs' claims are foreclosed by the holding in *Nolin v. Isbell,* 207 F.3d 1253 (11th Cir.2000), that a "minimal amount of force and injury ... will not defeat an officer's qualified immunity in an excessive force case." *Id.* at 1258. *Nolin* was decided on summary judgment, and the record there reflected an important fact not plead in the Amended Complaint: none of plaintiff's injuries necessitated medical treatment. The Court cannot determine as a matter of law that the amount of force was *de minimis* without a factual record establishing the degree of Plaintiffs' injuries. Allowing every permissible inference in Plaintiffs' favor, as the Court must on a motion to dismiss, Plaintiffs have sufficiently plead the issue of whether the amount of force was excessive.

*2) Count III: Fifth Amendment*

All fifty-two Plaintiffs assert claims for violation of their substantive due process rights to a liberty interest to be free from excessive force as guaranteed by the Fifth Amendment. Having determined that twenty of these Plaintiffs have properly

alleged that they were seized, their claims of excessive force are limited to analysis under the Fourth Amendment.[21] Accordingly, Count III of the Amended Complaint will dismissed as to these twenty Plaintiffs.

The substantive due process guarantee protects against government power arbitrarily and oppressively exercised. *See Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). In cases alleging abuses of executive power, only the most egregious conduct can be said to be "arbitrary in the constitutional sense." *Collins v. Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Plaintiffs acknowledge that official conduct is actionable under the Fifth Amendment only if it shocks the conscience, whether such conduct was intended to cause injury, or just deliberately indifferent to the constitutional rights of others.[22]

The standard of culpability by which the Court will test Reno's conduct depends on the circumstances. An official may be liable for establishing a policy or plan that results in deliberate indifference to constitutional rights, *see Rivas v. Freeman,* 940 F.2d 1491, 1495 (11th Cir.1991); or for failing to properly train a subordinate who causes harm by unconstitutional conduct, for which he would be individually liable. *See County of Sacramento v. Lewis,* 523 U.S. 833, 850 n. 10, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). A defendant who had sufficient time to prevent the alleged excessive use of force, conversely, can be held liable for mere deliberate indifference to plaintiffs rights. Defendant will be held to a standard of deliberate indifference only if she actually had the opportunity to consider what impact her decision would have on the Plaintiffs. *Id.* at 851, 118 S.Ct. 1708.

Plaintiffs advance the deliberate indifference standard of culpability, accusing Reno of carefully planning the raid and intending that Plaintiffs suffer deprivations of their constitutional rights. Plaintiffs' theory is that Defendant is liable for her "decision to unleash 151 heavily-armed, machine gun and gas wielding shock troops to transfer custody of a six-year old boy." Plaintiffs advance the following allegations which they contend demonstrate the conscience-shocking nature of Defendant's conduct: that Defendant acted under political pressure to resolve the situation quickly, rather than with regard to Plaintiffs' rights; that she obtained an invalid warrant on which to justify the raid; that she deliberately planned the raid in advance; and that she had knowledge of the Plaintiffs' presence when she issued the order to commence the raid. Though Reno denies having given any instruction as to what force, if any, should be used at the scene and contends that the determination to use force was made by agents at the scene, Plaintiffs' allege that the raid was specifically choreographed by Reno. For the purpose of deciding this motion, the Court must accept Plaintiffs' allegation that the raid was conducted exactly as it was planned by Defendant.

Plaintiffs acknowledged that the purpose of the governmental action was to

---

21. As noted above, the *Graham* Court held that claims of excessive force arising in the context of arrests or seizures are properly analyzed under the Fourth Amendment's "objective reasonableness standard," not the Fifth Amendment's substantive due process standard. *See Saucier v. Katz,* 533 U.S. 194,

121 S.Ct. 2151, 2155, 150 L.Ed.2d 272 (2001).

22. Plaintiffs' Opposition Memorandum, at 46 (citing *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)).

retrieve Elian, though they dispute the legality of the warrants authorizing the arrest. The Amended Complaint describes the scene of the arrest as having hosted "hundreds, sometimes thousands" of demonstrators, gathered both to support the Gonzalez family and to protest the government's decision to return Elian to his Cuban father. Under the circumstances described by Plaintiffs, the alleged assaults were neither particularly violent, nor was the number of law enforcement officers disproportionate to the objective need to maintain order, nor were the injuries allegedly sustained by the Plaintiffs significant.[23] Even if the force applied was unnecessary under the circumstances, no reasonable fact finder could conclude that Reno's decision to send 151 armed agent to execute the warrants deprived Plaintiffs' due process in a manner that shocks the conscience.[24]

Plaintiffs contend that the Court should not reach any determination at this stage of pleading as to the facts which might justify Defendants' use of force. Plaintiffs assert that any facts supporting Defendants' justification of force will come out through discovery, at which time Plaintiffs will have the opportunity to challenge their evidence. However, in reaching this determination, the Court has relied entirely upon the facts advanced in Plaintiffs' pleadings without regard to the defenses or justifications asserted by Defendants. Additionally, Plaintiffs have not proffered any case law supporting their contention

that the conduct alleged violates the due process clause, under any standard of intent. Nor is the Court aware of any such holding; at the very least, the absence of case law clearly establishing the illegality of such conduct would entitle Defendant to qualified immunity.

## V. Qualified Immunity

An officer will not be entitled to qualified immunity if, for example, "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand." *Saucier v. Katz,* — U.S. —, 121 S.Ct. 2151, 2157, 150 L.Ed.2d 272 (2001). Application of qualified immunity is the rule, not the exception. *See Lassiter v. Alabama A&M University Brd. of Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994). It is incumbent on Plaintiffs to show that the extraordinary circumstances of their case bring it into the exception. *See Samarco v. Neumann,* 44 F.Supp.2d 1276, 1296 (S.D.Fla. 1999).

The law was clearly established that governmental restriction of expressive conduct violated the First Amendment if the restriction was motivated by the speaker's message. Likewise, a reasonable officer in Reno's position would know that the law forbade her from directing the execution of a warrant in a manner that called for unjustified force against bystanders. *See, e.g., Sims v. Glover,* 84

---

**23.** Many of Plaintiffs suffered from eye, nose and throat irritation, skin rashes, headaches, and nausea from the gas; others experienced anxiety and sleeplessness; some sustained bruises and one Plaintiff sprained a wrist. The extent of Plaintiffs' alleged injuries are relevant here for different reasons than in the Fourth Amendment discussion above, addressing Defendant's contention that the use of force was *de minimis.* It is not inconsistent for the Court to conclude as it does that

Plaintiffs' injuries were relatively minor without finding that they were the result of a minimal use of force.

**24.** A comparison of the facts alleged to the case law further compels the conclusion that Plaintiffs could not prevail on any facts consistent with those pled. *See, e.g., Lee v. Williams,* 138 F.Supp.2d 748 (E.D.Va.2001) (denying due process claim of hostage shot in police stand-off with robbery suspects).

F.Supp.2d 1273, 1289 (M.D.Ala.1999) (denying qualified immunity on officer's motion to dismiss, where complaint alleged that seizure and application of force was wholly unjustified). Defendant's argument relating to her entitlement to qualified immunity adopts a construction of the alleged wrongful conduct, and of the corresponding right to be free from such wrongful conduct, which relies on circumstances not established in the pleadings. The Court must broadly construe Plaintiffs' allegations at this stage and may not adopt an interpretation of the facts that narrows Plaintiffs' claims. At this stage, the Defendant's assertion of qualified immunity will be denied without prejudice to reassert the defense on summary judgment, upon development of an evidentiary record.

## CONCLUSION

It is hereby ORDERED and ADJUDGED that Defendants' Motion to Dismiss is GRANTED in part and DENIED in part, as follows:

1) The Amended Complaint is DISMISSED, without prejudice, to the extent applicable to Defendants Doris Meissner, and Eric Holder. Plaintiffs may amend their claims, if at all, within twenty days of the date of this Order.

2) Count II is dismissed as to Plaintiffs Eva Espinosa, Triburcio Estupinan, Jose I. Garcia, Ledia Betancourt Garcia, and Rosa Garcia.

3) Count III of the Amended Complaint is DISMISSED with prejudice.

3) Defendants Motion is DENIED in all other respects.